**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                )
MUSLIM ADVOCATES,               )
                                )
            Plaintiff,          )
                                ) Civil Action No. 09-1754
        v.                      )
                                )
UNITED STATES DEPARTMENT        )
OF JUSTICE,                     )
                                )
            Defendant.          )
_____)

**MEMORANDUM OPINION**

    Plaintiff Muslim Advocates brings this action under the
Freedom of Information Act ("FOIA"), seeking the complete and
unredacted final version of certain chapters of the Domestic
Investigations and Operations Guide (the "DIOG") of the Federal
Bureau of Investigation ("FBI"), which were previously shown to
plaintiff and other civil rights and civil liberties groups
during two meetings at FBI headquarters in November 2008 (the
"November 2008 meetings").[1]  Plaintiff principally argues that
the FBI waived its right to withhold those chapters of the DIOG
after it allowed representatives of Muslim Advocates and other

_____
[1]    In its complaint, plaintiff initially sought disclosure of
the complete and unredacted final versions of the DIOG.  Compl.
¶ 1.  Plaintiff, however, subsequently limited its request to
"those four chapters of the DIOG that were circulated during the
November [2008] meetings[.]"  Pl.'s Combined Opp'n and Cross-
Mot. at 3.

organizations to review and take notes on the materials during the November 2008 meetings.  Defendant, the Department of Justice (the "government" or the "agency"), disputes plaintiff's allegation of waiver, and argues that it properly withheld the material pursuant to FOIA Exemption 7(E), 5 U.S.C. § 552(b)(7)(E), because production of the requested material would result in disclosure of specific internal investigatory techniques and procedures that are used by the FBI and would present a risk that "criminals, terrorists and foreign intelligence operatives would be assisted in or emboldened to violate the law and circumvent the FBI's enforcement efforts."[2] Def.'s Combined Opp'n & Reply at 2-3.

Pending before the Court are the parties' cross-motions for summary judgment.  Upon careful consideration of the motions, the responses and replies thereto, the parties' supplemental filings, the applicable law, and the entire record, including the agency's affidavits and the relevant chapters of the DIOG, the Court hereby **GRANTS IN PART AND DENIES IN PART** defendant's

---

[2]    In its motion for summary judgment, defendant also argued that it properly withheld the disputed material pursuant to FOIA Exemption (b)(2), 5 U.S.C. § 552(b)(2).  Following the Supreme Court's decision in *Milner v. Department of the Navy*, 131 S. Ct. 1259 (2011), however, defendant withdrew that argument.  *See* Def.'s Response to Pl.'s Notice, Docket No. 26 ("In light of the Supreme Court's decision in *Milner*, Defendant no longer relies on exemption (b)(2) to support its withholding of 'High 2' information.  It continues to rely on FOIA's exemption (b)(7)(E) as justification for the same withholdings[.]").

motion for summary judgment and **DENIES** plaintiff's cross-motion

for summary judgment.

I.    **Background**

      A.    **The DIOG**

      As noted above, plaintiff seeks release of certain chapters

of the FBI's Domestic Investigations and Operations Guide.  The

DIOG was written to consolidate policy pursuant to the Attorney

General's Guidelines for Domestic FBI Operations, which was

signed by Attorney General Michael Mukasey on September 29,

2008.  Pl.'s SMF ¶ 1.  In the preamble of the DIOG, FBI Director

Robert S. Mueller, III describes the purpose of the DIOG as

follows:

> While investigating crime, terrorism, and threats to
> the national security, and collecting foreign
> intelligence, the FBI must fully comply with all
> laws and regulations, including those designed to
> protect civil liberties and privacy. . . . To assist
> the FBI in its mission, the Attorney General signed
> *The Attorney General's Guidelines for Domestic FBI*
> *Operations* (AGG-Dom) on September 29, 2008.  The
> primary purpose of the AGG-Dom and the Domestic
> Investigations and Operations Guide (DIOG) is to
> standardize policy so that criminal, national
> security, and foreign intelligence investigative
> activities are accomplished in a consistent manner,
> whenever possible (e.g., same approval,
> notification, and reporting requirements). . . . The
> changes implemented by the DIOG should better equip
> [the FBI] to protect the people of the United States
> against crime and threat to national security and to
> collect foreign intelligence.

Docket No. 12-1, DIOG-11.  Implemented in December 2008, the

DIOG is a "'comprehensive 270-page collection of procedures,

standards, approval levels, and explanations[,]'" that contains

information "ranging from general principles to chapters

detailing the FBI's procedures for conducting clandestine

operations."  Def.'s Mot. at 2 (internal citations omitted).

**B.    The November 2008 Meetings & the December 2008
        Implementation of the DIOG**

Prior to implementing the DIOG, however, the FBI held two

meetings with civil rights and civil liberties groups in

November 2008.[3]  Specifically, by emails dated November 12, 2008

and November 17, 2008, the FBI invited various organizations to

attend two separate meetings as part of an outreach program to

obtain input on the civil liberty, privacy and civil rights

concerns on the DIOG.  Pl.'s SMF ¶ 7.  The invitation received by

Muslim Advocates provided as follows:

> The FBI Office of General Counsel (OGC) would like to
> invite you to participate in a discussion of
> respectively, civil liberty/privacy and civil rights
> protections in the FBI's new Domestic Investigative
> Operational Guidelines (which will implement the new
> AGG) on Wednesday November 19th at 1:00 pm at FBI
> headquarters. OGC will provide pertinent sections for
> you to read. The manual has not been finalized. Your
> input and suggestions will be well received and
> appreciated. Please RSVP by November 14, 2008.

Ex. A to the Declaration of Brenda Abdelall ("Abdelall Decl."),

Docket No. 16-3.

---

[3]    The Court will note that for purposes of resolving the
pending cross-motions, the FBI has agreed to accept Muslim
Advocates' version of events at the November 2008 meetings.  *See*
Def.'s Combined Opp'n & Reply at 6.

During the November 2008 meetings, a representative of the
FBI gave an introductory presentation about the DIOG.  Pl.'s SMF
¶ 12.  All of the attendees were provided with a copy of the
presentation, which they were required to return at the end of
the presentation.  Pl.'s SMF ¶ 12.

Attendees were also provided with Chapters 4, 5, 10, and 16
of the DIOG (the "disputed chapters").  Pl.'s SMF ¶ 13.  These
chapters discuss: (i) "Privacy and Civil Liberties, and Least
Intrusive Methods" (Chapter 4); (ii) "Assessments" (Chapter 5);
(iii) "Sensitive Investigative Matter / Academic Nexis" (Chapter
10); and (iv) "Undisclosed Participation" (Chapter 16).  *See*
Docket No. 12-1, DIOG-3 – DIOG-9.  The version of the disputed
chapters disclosed at the November 2008 meetings totaled
approximately 100 pages in length and did not contain any
redactions.  *See* Pl.'s SMF ¶ 15; Abdelall Decl. ¶ 10.[4]

After the introductory presentation concluded, attendees
were given time to review and take notes on the disputed
chapters.  Pl.'s SMF ¶ 16.  FBI Deputy General Counsel Dave
Larson remained in the room while the attendees reviewed the
materials and "told them that they could take their time

---

[4]    Although the chapters provided to the attendees were in
draft form, *see* Pl.'s SMF ¶ 13, the government has stipulated
for purposes of summary judgment "that the chapters of the DIOG
reviewed at these meetings were substantially the same as the
chapters in the final DIOG."  Def.'s Combined Opp'n & Reply at
2.

reviewing the documents." Pl.'s SMF ¶ 19. Mr. Larson also
"welcomed participant commentary and took notes on the
commentary." Pl.'s SMF ¶ 19.

At the conclusion of the meetings, which lasted
approximately two hours, attendees were required to return the
disputed chapters and were thanked for their help and feedback.
*See* Pl.'s SMF ¶ 20; Abdelall Decl. ¶¶ 20-21. Attendees were
permitted, however, to take their notes on the DIOG with them
and were never asked to return them. Pl.'s SMF ¶ 17. In
addition, attendees were not told that the material reviewed at
the meeting was confidential or that they could not share the
information with their respective groups, communities, or the
general public; nor were participants required to sign any
documents affirming that they would keep this information
confidential. Pl.'s SMF ¶ 18; *see also* Pl.'s SMF ¶ 8.

The day after the second meeting, on November 26, 2008,
Muslim Advocates and several other organizations that had
attended the November 2008 meetings wrote a letter to Director
Mueller "reiterating their concerns over the civil liberties and
civil rights implications of the DIOG, as well as expressing
concerns with the lack of meaningful review of the DIOG and
again calling for the public release." Pl.'s SMF ¶ 21; *see also*
Ex. H to Declaration of Farhana Khera ("Khera Decl."), Docket
No. 16-15 (requesting an opportunity for "meaningful review" of

the DIOG in advance of its scheduled implementation; explaining that "no copies [of the DIOG] have been released to date, ad [sic] participants in the briefings were not allowed to examine the 100-page document except during the live sessions, neither of which afforded sufficient time for a rigorous examination"). Despite plaintiff's request that implementation of the DIOG be delayed, *see* Ex. H to Khera Decl., Docket No. 16-15, the DIOG was implemented on December 16, 2008, *see* Pl.'s SMF ¶ 23.

### C. Plaintiff's FOIA Request & Initiation of this Action

Soon thereafter, on January 28, 2009, plaintiff sent a FOIA request to the DOJ Office of Information and Privacy and the FBI FOIA Requester Service Center. Pl.'s SMF ¶ 25. The FBI responded to plaintiff's FOIA request on March 18, 2009, informing plaintiff that portions of the DIOG would be released to the public on the FBI's public website, and that it was therefore closing plaintiff's FOIA request. Pl.'s SMF ¶ 27. On May 15, 2009, after nearly two months of waiting for the public release of the DIOG, plaintiff appealed the decision to close its FOIA request to the Office of Information and Privacy. Pl.'s SMF ¶ 30. The office acknowledged receipt of the appeal on May 27, 2009, but did not release the DIOG. Pl.'s SMF ¶ 31. Plaintiff then filed suit in this Court on September 16, 2009 seeking disclosure of the DIOG. *See* Compl. ¶ 1.

Following plaintiff's initiation of this action, the FBI
posted a redacted version of the DIOG on its website on
September 25, 2009.  *See* Pl.'s SMF ¶ 46.  In response to this
limited release, plaintiff filed an amended complaint, in which
it renewed its request for a "complete and unredacted final
version" of the DIOG, arguing that the redacted material was
"wrongfully withheld."  Am. Compl. ¶¶ 34, 35; *see also* Am.
Compl. ¶ 2 ("On September 25, 2009, the Department posted a
significantly redacted version of the DIOGs to the FBI website,
withholding nearly entire sections on a number of topics—
including sections that address the infiltration of Muslim
community and religious organizations.  These redactions are
particularly unjustifiable because unredacted versions of these
key sections were discussed and/or included in the version shown
to Plaintiff during the November 2008 meetings.").

The agency subsequently filed a motion for summary
judgment. Although defendant initially sought summary judgment
as to all of the information withheld in the DIOG, the scope of
this litigation was significantly narrowed by plaintiff's
decision to limit its arguments to "those four chapters of the
DIOG that were circulated during the November [2008] meetings -
Chapters 4, 5, 10, and 16[.]"  Pl.'s Combined Opp'n and Cross-
Mot. at 3.  The scope of this litigation was further narrowed
after the agency then determined that Chapter 4 of the DIOG

could be released "without harm" and produced that chapter in its entirety. *See* Def.'s Combined Opp'n & Reply at 3. Pending before the Court, therefore, are cross-motions for summary judgment regarding the FBI's decision to withhold certain information contained in Chapters 5, 10, and 16 of the DIOG. Those motions are now ripe for determination by the Court.

## II. Legal Framework

### A. Rule 56

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Likewise, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*, 658 F. Supp. 2d 217, 224

(D.D.C. 2009) (citing *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975)).

## B. FOIA

FOIA requires agencies to disclose all requested agency records, 5 U.S.C. § 552(a), unless one of nine specific statutory exemptions applies, *id.* § 552(b). "It is designed to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Consumers' Checkbook, Ctr. for the Study of Servs. v. United States HHS*, 554 F.3d 1046, 1057 (D.C. Cir. 2009) (internal quotation marks omitted). "Consistent with 'the basic policy that disclosure, not secrecy, is the dominant objective of the Act,' the statutory exemptions are 'narrowly construed.'" *Id.* (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)); *see also Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) ("Given the FOIA's broad disclosure policy, the United States Supreme Court has 'consistently stated that FOIA exemptions are to be narrowly construed.'" (quoting *Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988))).

"FOIA's 'strong presumption in favor of disclosure places the burden on the agency' to justify nondisclosure." *Consumers' Checkbook*, 554 F.3d at 1057 (quoting *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)). The government may satisfy its burden of establishing its right to withhold information from the public by submitting appropriate declarations and, where necessary, an

index of the information withheld. *See Vaughn v. Rosen*, 484 F.2d 820, 827-28 (D.C. Cir. 1973). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *ACLU v. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011). Moreover, "'an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.''" *ACLU*, 628 F.3d at 619 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

## III. Discussion

### A.    Waiver

The threshold issue before the Court is whether the FBI waived its right to invoke Exemption 7(E)[5] and withhold the redacted material in the disputed chapters of the DIOG after it allowed members of various civil rights and civil liberties

---

[5]    Exemption 7(E) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).

groups to review unredacted versions of the chapters during the November 2008 meetings. Plaintiff argues that waiver has occurred, explaining that because the FBI "already disclosed chapters 4, 5, 10, and 16 to members of the general public . . . [it] can no longer rely on any exemption to continue withholding the requested information." Pl.'s Combined Opp'n & Cross-Mot. at 17. Defendant, by contrast, contends that "because the contested provisions of the DIOG have not been made part of a permanent public record, the FBI has not waived any FOIA exemptions." Def.'s Combined Opp'n & Reply at 6. For the reasons discussed below, the Court agrees with defendant and finds that no waiver occurred.

In this Circuit, the "public-domain doctrine" has emerged as the dominant paradigm for evaluating the waiver of a potential FOIA exemption. "Under [the] public-domain doctrine, materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record." *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999) (citing *Niagara Mohawk Power Corp. v. United States Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999) (Exemption 4); *Public Citizen v. Dep't of State*, 11 F.3d 198, 201-03 (D.C. Cir. 1993) (Exemption 1); *Davis v. United States Dep't of Justice*, 968 F.2d 1276, 1276 (D.C. Cir. 1992) (Exemptions 3 & 7(C)); *Afshar v. Dep't of State*, 702 F.2d 1125,

1130-34 (D.C. Cir. 1983) (Exemptions 1 & 3)).  The logic of this

doctrine is that "where information requested 'is truly public,

then enforcement of an exemption cannot fulfill its purposes.'"

*Id.* (quoting *Niagara Mohawk*, 169 F.3d at 19).  "[A] plaintiff

asserting that information has been previously disclosed bears

the initial burden of pointing to specific information in the

public domain that duplicates that being withheld."  *Public

Citizen*, 11 F.3d at 201.

Plaintiff principally argues that the disputed chapters of

the DIOG are in the public domain because the FBI allowed

individuals outside of the agency to review the material.  *See*

Pl.'s Combined Opp'n & Cross-Mot. at 18 ("By handing out [the

disputed chapters] to persons outside the agency, the FBI

knowingly released the information to the public[.]" (citing

*Leadership Conf. on Civil Rights v. Gonzales*, 404 F. Supp. 2d

246, 254-55 (D.D.C. 2005)[6]); Pl.'s Reply at 6 ("When the FBI

_____

[6]     The Court finds plaintiff's reliance on *Leadership
Conference on Civil Rights* misplaced as that case does not
address the issue of waiver or the public-domain doctrine.
Instead, it deals with whether the government properly withheld
certain documents pursuant to Exemption 5 of FOIA, which
protects "inter-agency or intra-agency memorandums or letters
which would not be available by law to a party other than an
agency in litigation with the agency."  5 U.S.C. § 552(b)(5).
That court found that Exemption 5 was inapplicable, explaining
that "[b]ecause the 2004 training manual was made available to
individuals not associated with the executive branch, it cannot
be 'inter-agency or intra-agency' communication, and thus does
not satisfy the requirements for application of the deliberative
process privilege of Exemption 5."  *Leadership Conf. on Civil*

allowed members of the general public to read and take notes on
the four chapters of the DIOG, it released the information in
those chapters to the public and lost control over the
distribution of that information.  Members of the general public
now control that information, which puts it in the public
domain.").  The Court finds this argument unpersuasive.

Although the FBI allowed Muslim Advocates and several other
civil rights and civil liberties groups to view the disputed
chapters during a two-hour meeting at FBI headquarters, the
Court is not convinced that such a limited review is sufficient
to satisfy the requirements of the public-domain doctrine in the
absence of evidence that the disputed chapters are now "truly
public."  *Cottone*, 193 F.3d at 555.  Indeed, the Circuit has
counseled that "[f]or the public domain doctrine to apply, the
specific information sought must have already been 'disclosed
and preserved in a permanent public record.'"  *See Students
Against Genocide v. Dep't of State*, 257 F.3d 828, 836 (D.C. Cir.
2001).

On this point, the Court finds the D.C. Circuit's decision
in *Students Against Genocide* particularly instructive.  That
case involved classified "spy satellite" and "spy plane"

_____

*Rights*, 404 F. Supp. 2d at 255.  Because *Leadership Conference
on Civil Rights* dealt with whether an agency properly asserted a
particular FOIA exemption, *id.* at 254 – *not* whether the agency
had waived its right to assert the particular FOIA exemption –
the Court finds it inapposite to the facts of this case.

photographs that then-U.S. Ambassador Madeleine Albright showed
to members of the United Nations Security Council.  257 F.3d at
830.  The plaintiff organizations in that case argued that
Ambassador Albright waived the government's right to invoke the
pertinent FOIA exemptions (Exemptions 1 and 3) by displaying the
withheld photographs to the delegates of the foreign governments
that were members of the Security Council.  *Id.* at 836.  The
Circuit rejected plaintiff's argument, explaining that:

> The photographs in question here plainly do not fall
> within the [public domain] doctrine.  They were not
> released to the general public; only the Security
> Council delegates saw them.  In fact, the
> photographs were not "released" at all.  Although
> Ambassador Albright displayed them to the delegates,
> she retained custody, and none left the U.N.
> chamber.  Hence, there is no "permanent public
> record" of the photographs.

*Id.* at 836 (internal citations omitted) (citing *Cottone*, 193
F.3d at 554).  After also rejecting the plaintiff organizations'
"slight variation[s]" on the public-domain doctrine theme, the
Circuit concluded that the government had not waived its right
to withhold the classified photographs from release under FOIA
by displaying them to the Security Council.  *Id.* at 836, 837.

Similarly, in this case, the disputed chapters were not
released to the general public; rather, they were only shown to
a select group of organizations – personally invited by the FBI
– at FBI headquarters.  Although the attendees were permitted to
view and take notes on the disputed chapters for approximately

two hours, they were required to return the documents at the end

of the meeting.  As none of the disputed chapters left FBI

headquarters, the Court finds that there is no "permanent public

record" of the disputed chapters in the public domain.

Plaintiff attempts to circumvent the public-record

requirement by arguing that "[t]he free and full note taking

allowed during the meeting . . . provided the meeting

participants with ample means to make the distributed material

part of the permanent public record, therefore satisfying this

standard."  Pl.'s Combined Opp'n & Cross-Mot. at 19 n.5; *see*

*also* Pl.'s Reply at 9 (arguing that the retention of notes

created a permanent public record).  The Court finds this

argument unpersuasive.  Even assuming that plaintiff had "ample

means" to make a permanent record of the approximately 100 pages

of the DIOG that was distributed during the two-hour meeting,

plaintiff has produced no evidence that the redacted sections of

the disputed chapters are, in fact, in the public domain.

While the D.C. Circuit has not established "a uniform,

inflexible rule requiring every public-domain claim to be

substantiated with a hard copy simulacrum of the sought-after

material[,]" it has recognized that "it will very often be the

case that some type of hard copy facsimile will be the only

practicable way for a FOIA requester to demonstrate that the

specific information he has solicited has indeed circulated into

the public domain." *Cottone*, 193 F.3d at 555. No such evidence
has been provided in this case. Without such documentation, the
Court lacks confidence that the redacted portions of the
disputed chapters are "truly public." *See id.* (explaining that
"while the 'logic of FOIA' postulates that an exemption can
serve no purpose once information – including sensitive law-
enforcement intelligence – becomes public, [courts] must be
confident that the information sought is truly public and that
the requester receive no more than what is publicly available
before we find a waiver" (internal citation omitted)).

The Court will note that its lack of confidence stems, in
part, from plaintiff's repeated complaints regarding its
inability to conduct a "meaningful review" of the DIOG. Pl.'s
SMF ¶ 21. Indeed, the letter that Muslim Advocates sent to FBI
Director Mueller immediately following the November 2008
meetings argued that a "meaningful review" of the DIOG was
necessary, explaining that "no copies have been released to
date, ad [sic] participants in the briefings were not allowed to
examine the 100-page document except during the live sessions,
neither of which afforded sufficient time for a rigorous
examination." Ex. H to Khera Decl., Docket No. 16-15.
Plaintiff reiterated those concerns in its FOIA request, in
which it complained that participants in the November 2008
meetings "were allowed only limited time to examine the 100-page

document, which was insufficient for a meaningful review."

Def.'s Ex. 2, Docket No. 12-8.  As the participants in the

November meetings lacked sufficient time for a "rigorous

examination" or "meaningful review" of the disputed chapters,

the Court is not persuaded – absent some evidence to the

contrary – that the note-taking participants assembled a

permanent public record that "duplicates that being withheld."

*Public Citizen*, 11 F.3d at 201.[7]

---

[7]     If there was a permanent public record of the disputed
chapters then plaintiff would not have had to file a FOIA
request in order to conduct a meaningful review of the material.
*See Assassination Archives and Research Ctr. v. Central
Intelligence Agency*, 334 F.3d 55, 60 n.6 (D.C. Cir. 2003) ("[A]s
a practical matter waiver under [the public-domain doctrine]
yields the FOIA plaintiff little new information.  Indeed, if a
plaintiff can establish that the specific records he seeks have
become 'freely available, there would be no reason to invoke the
FOIA to obtain access to the information.'" (quoting and
discussing *Davis v. Dep't of Justice*, 968 F.2d 1276, 1279-80
(D.C. Cir. 1992)) (internal citations omitted)).  Although
plaintiff contends that this "broad view of the public domain
doctrine renders FOIA meaningless[,]" Pl.'s Reply at 10, the
Court disagrees.  As noted above, the public-domain doctrine is
premised upon the logic that a FOIA exemption can no longer
serve its purpose when there is a permanent public record of the
requested information.  *See Cottone*, 193 F.3d at 554.  The Court
is not persuaded, however, that the application of the public-
domain doctrine in this case – a case where a FOIA exemption can
still serve its purpose because the information requested is *not*
truly public - renders FOIA meaningless.  *See Students Against
Genocide*, 257 F.3d at 836 ("This circuit has held that the
government may not rely on an otherwise valid exemption to
justify withholding information that is already in the 'public
domain.'  We have noted, however, that while the logic of FOIA
postulates that an exemption can serve no purpose once
information . . . becomes public, we must be confident that the
information sought is truly public and that the requester

The Court, therefore, finds that plaintiff has failed to
meet its "initial burden of pointing to specific information in
the public domain that appears to duplicate that being
withheld." *Afshar*, 702 F.2d at 1130; *see also, e.g.*, *Davis*, 968
F.2d at 1280 ("[T]o obtain portions of tapes alleged to be in
the public domain, [the FOIA applicant] has the burden of
showing that there is a permanent public record of the exact
portions he wishes. It does not suffice to show - as he has done
- that *some* of the tapes were played to shift the burden to the
government. [The FOIA applicant] has not satisfied his burden to
point to specific information in the public domain.").[8]
Accordingly, plaintiff's motion for summary judgment is **DENIED.**

---

receive no more than what is publicly available before we find a
waiver." (internal citations and quotation marks omitted)); *cf.*
*Prison Legal News v. Exec. Office for United States Attys.*, 628
F.3d 1243, 1253 (10th Cir. 2011) ("The public domain doctrine is
limited and applies only when the applicable exemption can no
longer serve its purpose.  Given that the public domain doctrine
nowhere appears in the statutory text of FOIA, only the failure
of an express exemption to provide any protection of the
interests involved could justify its application.").

[8]     Plaintiff also argues that "this Court should apply a less
deferential waiver standard for material withheld under
Exemption 7(E), and not the national security standard developed
under Exemption 1."  Pl.'s Combined Opp'n and Cross-Mot. at 23.
The Court finds this argument unpersuasive for several reasons.
First, the D.C. Circuit has never limited application of the
public-domain doctrine to cases involving national security,
but, instead, has applied it in several non-national security
contexts.  *See, e.g.*, *Cottone*, 193 F.3d at 554 (citing cases
that apply the public-domain doctrine in the context of FOIA
Exemptions 1, 3, 4, and 7(C)).  The Court will nevertheless

**B.    Exemption 7(E)**

Having found that no waiver occurred, the Court must now

determine whether the agency properly withheld material from 52

---

note, however, that "the FBI's rationale for withholding
portions of the DIOG is directly intertwined with concerns
regarding national security. . . . In considering the risks of
widespread disclosure of certain DIOG provisions, the FBI
explicitly found that concerns about national security and
counterintelligence issues counseled withholding."  Def.'s
Combined Opp'n & Reply at 13 (internal citations omitted).
Therefore given both the "circumstances of prior disclosure" –
in which a small group of civil rights and civil liberties
groups were invited to FBI headquarters and given approximately
two hours to review and give feedback to the FBI on the civil
liberty, privacy, and civil rights concerns of the FBI's
domestic investigation guidelines - and "the particular
exemption[] claimed" – i.e., Exemption 7(E)'s protection of
information compiled for law enforcement purposes, the Court
finds that application of the public-domain doctrine is
appropriate in this case. *Carson v. U.S. Dep't of Justice*, 631
F.2d 1008, 1015 n.30 (D.C. Cir. 1980).

The Court will also note its disagreement with plaintiff's
contention that this Court "should follow the strong presumption
of disclosure under FOIA in fashioning a test for waiver under
7(E) that results in a narrow exemption from disclosure."  Pl.'s
Reply at 4 (citing *Wolf*, 473 F.3d at 374).  In *Wolf*, the D.C.
Circuit stated as follows:  "The FOIA mandates broad disclosure
of government records to the public, subject to nine enumerated
exemptions.  Given the FOIA's broad disclosure policy, the
United States Supreme Court has 'consistently stated that FOIA
exemptions are to be narrowly construed.'"  473 F.3d at 374
(internal citations omitted).  Despite plaintiff's arguments to
the contrary, the Court is not persuaded that FOIA's broad
presumption in favor of disclosure is applicable in the waiver
context.  Indeed, the Court finds its obligation to narrowly
construe FOIA exemptions in favor of requiring an agency to
disclose information that is being improperly withheld,
fundamentally different than creating a less stringent waiver
standard whereby an agency loses the right to assert an
otherwise applicable FOIA exemption (and is thereby required to
disclose information that is not truly public).

pages of the DIOG pursuant to Exemption 7(E).  As noted above,

Exemption 7(E) protects records or information compiled for law

enforcement purposes from disclosure "to the extent that the

production of such law enforcement records or information . . .

would disclose techniques and procedures for law enforcement

investigations or prosecutions, or would disclose guidelines for

law enforcement investigations or prosecutions if such

disclosure could reasonably be expected to risk circumvention of

the law."  5 U.S.C. § 552(b)(7)(E).  Courts have held that

information pertaining to law enforcement techniques and

procedures is properly withheld where disclosure reasonably

could lead to circumvention of laws or regulations.  *See, e.g.*,

*Skinner v. Dep't of Justice*, 744 F. Supp. 2d 185, 214 (D.D.C.

2011) (citing cases).  "[A] highly specific burden of showing

how the law will be circumvented" is not required; instead,

"exemption 7(E) only requires that [the agency] 'demonstrate[]

logically how the release of [the requested] information might

create a risk of circumvention of the law.'"  *Mayer Brown LLP v.

IRS*, 562 F.3d 1190, 1994 (D.C. Cir. 2009) (quoting *PHE, Inc. v.

Dep't of Justice*, 983 F.2d 248, 251 (D.C. Cir. 1993)).

Defendant asserts Exemption 7(E) in order to "protect

information consisting of special internal investigatory

techniques and procedures that are used by the FBI . . . [that]

if release[d] could reasonably be expected to give anyone with

21

that particular knowledge the ability to circumvent the law." Declaration of John S. Pistole, Docket No. 13-5 ("Pistole Decl.") ¶ 30. Defendant explains that "revelation of [the redacted material] could enable the targets of these techniques to avoid detection or develop countermeasures to circumvent the ability of the FBI to effectively use this important national security law enforcement technique." Pistole Decl. ¶ 30.[9]

With respect to the 52 pages of redactions at issue in this case, defendant has submitted an affidavit that specifically identifies ten categories of information involving the FBI's techniques and procedures, which it avers, "would cause harm to FBI's criminal and national security investigations" if released. *See* Def.'s Combined Opp'n & Reply at 5; Pistole Decl. ¶ 7. Those categories are: (i) information identifying the contents of particular file numbers, forms, and databases; (ii) information about the FBI's operational directives;

---

[9]    Defendant also avers that "[t]he FBI's rationales for withholding this information must be understood in the larger context of the current security and criminal prosecution climate. In addition to combating the criminal acts of sophisticated illicit enterprises (such as organized crime syndicates and drug cartels), the FBI is also charged with protecting the nation from security risks posed by individuals, organizations (such as terrorist groups), and foreign nations that seek to harm the United States. The FBI's public disclosure of information is carefully scrutinized by the enemies of the United States. Intelligence services and terrorists use open-source information to gather intelligence about United State's capabilities and methods. . . ." Pistole Decl. ¶ 8.

(iii) specific scenarios in which specific techniques are
authorized; (iv) approval limitations on techniques or
procedures that may be used in certain types of investigations;
(v) identification of obscure capacities and investigative
techniques; (vi) the scope of sensitive investigative matters;
(vii) information on the duration for which particular actions
are authorized; (viii) details about undisclosed participation;
(ix) information concerning the FBI's collection and/or analysis
of information; and (x) certain terms and definitions. *See*
Def.'s Combined Opp'n & Reply at 5; *see also* Pistole Decl. ¶ 7.
In its affidavit, defendant provides descriptions of each of
these categories and discusses how release of the information
within that particular category could create a risk of
circumvention of the law. *See generally* Pistole Decl.; *see also*
Def.'s Mot. 6-22.

In its opposition brief, Muslim Advocates does not
challenge the applicability of Exemption 7(E) nor does it
challenge the rationale for any of the categories of redactions.
*See generally* Pl.'s Combined Opp'n & Cross-Mot. at 27-34.
Instead, plaintiff more generally responds by reprising its
waiver argument, asserting that "the same facts supporting a
finding of waiver at the very least call into question whether
the information the FBI seeks to protect is sufficiently
'unknown to the public' to qualify for Exemption 7(E)." Pl.'s

Combined Opp'n & Cross-Mot. at 27; *see also* Pl.'s Reply at 12

("The Department's own actions in holding the meetings without

confidentiality restrictions refute its current claim that

disclosure of the materials risks circumvention of the law.").

Plaintiff then points to "numerous press reports about the FBI's

infiltration of mosques and use of undercover agents or

confidential informants to gather information from members of

ethnic or religious communities," and argues that those

materials create "a material issue of fact regarding whether the

material claimed exempt is generally known to the public such

that the FBI should not be granted summary judgment."  Pl.'s

Combined Opp'n & Cross-Mot. at 29-30.[10]

The Court finds these arguments unpersuasive.  With respect

to plaintiff's waiver argument, the Court agrees with defendant

that "[t]here is a difference between showing the contested DIOG

provisions to a limited audience of a handful of representatives

of particular public interest groups and generally disclosing

the actual document itself to the public at large."  Def.'s

---

[10]   Plaintiff also argues that "[t]he FBI is not entitled to
summary judgment for the additional and independent reason that
it errs in baldly attempting to deny the significant public
interest in the DIOG – a public interest that it has repeatedly
recognized."  Pl.'s Opp'n & Cross-Mot. at 31.  While the Court
is sensitive to plaintiff's frustration regarding its inability
to obtain an unredacted copy of the DIOG, the Court is not
persuaded that that the FBI's purported minimization of "the
strong public interest in releasing the DIOG to the public" is
an independent ground upon which to deny summary judgment.
Pl.'s Opp'n & Cross-Mot. at 31.

Combined Opp'n & Reply at 17.  Because "[d]isclosing the DIOG in
the way Muslim Advocates now demands would increase the risk
that criminal elements would either be emboldened to commit
crimes or structure their activities to evade detection[,]"
Def.'s Combined Opp'n & Reply at 18, the Court finds that the
FBI's limited disclosure at the November 2008 meetings does not
preclude the agency's claim of Exemption 7(E) as to the redacted
material.[11]  Nor is the Court convinced that plaintiff's news
articles create a genuine issue of material fact regarding
whether the FBI's techniques and procedures are sufficiently
unknown to the public.  Although some information regarding the
FBI's use of the particular techniques and procedures discussed
in the disputed chapters may be known, "[t]here is no principle
. . . that requires an agency to release all details concerning
[its] techniques simply because some aspects of them are known
to the public[.]"  *Barnard v. Dep't of Homeland Sec.*, 598 F.
Supp. 2d 1, 23 (D.D.C. 2009) (rejecting the plaintiff's argument
that information regarding particular procedures witnessed by

---

[11]   *See also* Def.'s Combined Opp'n & Reply at 18 ("More widely
distributing the DIOG would allow an opportunity for close
analysis of the document's provisions that was not provided at
the meetings at issue in this matter. . . . [I]mmediately after
the meetings at issue, Muslim Advocates complained that the
meetings did not, in fact, allow for careful analysis of the
DIOG.  Making a full public release of the DIOG would allow just
such a detailed review and would not be limited to entities
familiar to the FBI.").

the plaintiff and others could no longer be withheld); *see also, e.g.*, *Blanton v. Dep't of Justice*, 63 F. Supp. 2d 35, 49-50 (D.D.C. 1999) (finding that public information regarding the FBI's use of polygraph tests, including "[b]ooks that claim to reveal its techniques and ways to beat the test," did not require disclosure of the information withheld by the FBI; explaining that this public information, "although widely available," did not "indicate the specific methods employed by the FBI" (internal quotation marks omitted)).  Because "the public does not have specific knowledge of the circumstances in which undisclosed participation is or is not allowed in FBI investigations or what undisclosed participants are or are not allowed to do," Def.'s Combined Opp'n & Reply at 19, the Court is not persuaded that plaintiff's news articles require the FBI to release the redacted portions of the DIOG.

Therefore, having carefully considered the parties' arguments, the agency's affidavits, as well as the redacted materials, the Court hereby **GRANTS IN PART AND DENIES IN PART** the government's motion for summary judgment.  The Court first finds that the government is entitled to summary judgment as to the material it withheld in Chapters 5 and 10 of the DIOG. Specifically, the Court concludes, based upon the limited amount of information withheld from those chapters, that the agency's affidavits, in conjunction with a review of the released

material and the agency's index, provides the Court with enough context to conclude that the FBI fairly and accurately described the withheld material and the potential danger created by its release.  The Court is not so persuaded, however, with respect to Chapter 16.  That chapter is entirely redacted with the exception of the opening paragraph and Section 16.1.A.  *See* Docket No. 12-4, DIOG 253 - DIOG 266.  Although the agency's affidavit establishes the general applicability of Exemption 7(E) to the withheld material, *see* Pistole Decl. ¶¶ 25, 45, the Court finds that the affidavit is not sufficiently detailed to allow this Court to undertake a meaningful assessment of the redacted material.  Therefore, in light of plaintiff's objections regarding the "nearly wholesale redaction" of Chapter 16, *see* Pl.'s Reply at 12, as well as the extremely unusual facts of this case, the Court finds it appropriate to require the government to submit a more specific affidavit providing additional details in support of its extensive redactions in this chapter.  Accordingly, the Court hereby **DENIES** defendant's motion for summary judgment as to Chapter 16 without prejudice pending receipt of this additional affidavit.  If necessary, the government may submit the declaration *ex parte*.  *See, e.g.*, Pistole Decl. ¶ 31 (explaining that its affidavit contains "as much information as the FBI can provide about the redacted material without potentially increasing the risk that FBI

techniques or procedures will be circumvented or potential

lawbreakers will be encouraged to engage in illegal

activities").[12]  This supplemental affidavit shall be filed by no

later than November 30, 2011.

**IV.   CONCLUSION**

For the reasons set forth above, the Court **GRANTS IN PART**

**AND DENIES IN PART** defendant's motion for summary judgment and

**DENIES** plaintiff's cross-motion for summary judgment.  A

separate Order accompanies this Memorandum Opinion.

**SIGNED:**          **Emmet G. Sullivan**
                 **United States District Court Judge**
                 **November 10, 2011**

---

[12]    Because the Court finds that the FBI has generally
established that the material redacted from the disputed
chapters could reasonably be expected to potentially increase
the risk of circumvention of the law, the Court declines to
reach defendant's alternative argument that the redacted
portions of the DIOG are "categorically exempt" from disclosure
under Exemption 7(E).